STATE OF NEVADA DEPARTMENT OF COMMERCE, REAL ESTATE DIVISION, Appellant, *v.* CLEMENS F. SOELLER, Respondent.

No. 12418

MAVIS L. LUND; LOWELL THOMAS; SYBIL W. THOMAS; Tnt INVESTMENTS, INC., a Nevada Corporation, dba SIERRA REALTY, Appellants, *v.* NEVADA REAL ESTATE DIVISION, DEPARTMENT OF COMMERCE, STATE OF NEVADA, Respondents.

No. 12547

December 29, 1982                    656 P.2d 224

*Richard H. Bryan,* Attorney General, *Franklin C. Hoover* and *Steven F. Stucker,* Deputy Attorneys General, Carson City, for State of Nevada, Department of Commerce, Real Estate Division.

*Johnson, Belaustegui & Robison,* Reno, for Clemens F. Soeller.

*Raggio, Wooster, Clontz & Lindell,* Reno, for Mavis Lund.

*David K. Baba,* Reno, for Lowell Thomas and Sybil Thomas.

## OPINION

By the Court, MOWBRAY, J.:

The Nevada Real Estate Advisory Commission found realtors Clemens Soeller, Mavis Lund, Sybil Thomas and Lowell Thomas in violation of NRS 645.630 and the rules and regulations promulgated thereunder based on their conduct concerning a particular real estate transaction. The Commission also found Soeller and Lund in violation of the Real Estate Code of Ethics.

The Commission ordered the revocation of Lund's license and ordered thirty-day suspensions of the licenses of Soeller and the Thomases.

Pursuant to NRS 645.760(2), Lund, Soeller and the Thomases appealed from the Commission's orders to the district court. Judge Torvinen vacated the license suspension of Soeller. Judge Breen sustained the revocation of Lund's license and the suspension of the Thomases' licenses.

In Case No. 12418, the Real Estate Division appeals from the district court order granting relief to Soeller. Lund and the Thomases appeal from the order sustaining the decision of the Commission in Case No. 12547. The two cases are consolidated for purposes of this appeal.

The fundamental issue in each case is whether there is substantial evidence in the record to support the Commission's decision. We hold that substantial evidence exists, and we

therefore reverse the district court's order in Case No. 12418 and affirm the district court's order in Case No. 12547.

## THE FACTS

Clemens F. Soeller, qualifying broker of Crystal Shores Realty, listed for sale the Lake Tahoe property of Mr. and Mrs. James DeWitt Bennett, who reside in Southern California. Mavis Lund, a salesperson associated with Tahoe Sierra Realty, made an offer on her own behalf to purchase the property at the listed price of $63,500, contingent on her obtaining financing. Lund prepared and signed a standard purchase agreement and earnest money receipt that acknowledged receipt of an earnest money deposit of $1,000 by Tahoe Sierra Realty. However, Lund never deposited that earnest money. Moreover, the purchase agreement did not contain any date for the close of escrow. Soeller did not review the document before it was sent to the Bennetts. The Bennetts accepted Lund's offer. Lund opened an escrow without depositing any earnest money, and never formally closed it.

Lund was unable to obtain financing for the purchase, and communicated this information to Soeller. Because Soeller was about to leave for a vacation, he told Lund to deal directly with the Bennetts. Lund called Mrs. Bennett and withdrew her offer, and Mrs. Bennett acceded to that withdrawal. No written cancellation of the Bennett-Lund "escrow" was ever made. Soeller stated that he left the cancellation of the deal to Lund because she "wrote the deal out . . . it was her responsibility . . . ."

Mrs. Bennett held a power of attorney for her husband, who was in the merchant marine. She subsequently informed both Lund and Soeller that she wished to increase the listed price to $67,500, and a change order for the Multiple Listing Service was prepared.[1] Soon thereafter, one of Lund's colleagues approached Lund about a client, Carmen Sylvia Howarth, who was interested in purchasing the Bennett property. Lund expressed willingness to sell the property for $67,500, and Howarth offered that price. Lund contacted Soeller, and Soeller presented the offer to the Bennetts.

---

[1]Mrs. Bennett testified as follows:

MRS. BERKELEY (counsel for the Commission):   Yes, go right ahead.

MRS. BENNETT:   The day that she [Lund] called me and said she canceled, I called Mr. Soeller that evening. In fact, I told her that I was—that I had asked her to call Mr. Soeller, to tell him that, as of that date, that I raised the price sixty-seven-five, since she didn't want it any more. So, then I thought about it, after I hung up. I

Soeller explained to Mrs. Bennett that Lund was going to buy her property at $63,500 and "double escrow" it to another party at $67,500. He stated that it was legal, and when she questioned him about the Lund cancellation, he said that Lund "still had it, that it was still okay . . . ." Upon Mr. Bennett's return home from sea, Soeller informed him of the new offer, but explained that the Bennetts would net the same amount they would have netted at the old price due to a different commission split. Soeller's commission was to remain the same as it was on the $63,500. Thus, Soeller would receive, $1,778 (40 percent of 7 percent of $63,500) and Tahoe Sierra Realty would get $6,667 (60 percent of 7 percent of $63,500, plus $4,000). Soeller testified that he told the Bennetts that Tahoe Sierra "felt they were entitled to [the commission], or they would take the buyer and go somewhere else," and that the commission payment was part of the offer.[2] The Bennetts accepted the offer.[3]

called Clem [Soeller] and told them that the price had been raised to sixty-seven-five, and that was the reason for this.

MRS. BERKELEY: Did you mention to Mrs. Lund, when you spoke to her—did you mention, when you spoke with Mrs. Lund on the day that she called you to tell you she was no longer interested in the property, that you were raising the price?

MRS. BENNETT: Yes. I told her that I had gotten a notice from the insurance company that had the house, telling me that they were raising our premiums to—well, they valued it at seventy-six thousand now, or, at that time, and that they were raising our premiums. So I felt that I would raise the price to sixty-seven-five, because of that, which is still underpriced.

MRS. BERKELEY: Did Mr. Soeller put the property back on the market?

MRS. BENNETT: Yes, I believe he did . . . .

[2] Apparently Soeller did not suggest to his clients that they should make a counteroffer with a commission split more favorable to themselves.

[3] Mr.. Bennett testified as follows:

MR. BABA (counsel for Lund and the Thomases): Isn't it true, sir, according to the statement on November 2nd, of 1977, you were completely willing to approve the deal that was tendered to you?

MR. BENNETT: I was willing to approve it, because—

MR. BABA: Because why?

MR. BENNETT: That is what I wanted you to say: Because in every conversation that we have had over that lousy house, these people tell me, "You don't have to sell." But they say it in a way, with an innuendo, that says you don't have to sell. Well, I am not an idiot. I know that I don't have to sell my house. But I can get in a lot of trouble if I refuse a legitimate offer. Now, I am presented with this double escrow by Mavis Lund, which is driving me absolutely mad, down there in L.A. The Mavis Lund thing was canceled, and then they come back to me again. Mrs. Bennett got a telephone call. They said,

No fewer than three, and perhaps more, sets of escrow instructions were prepared. Eventually the double escrow from the Bennetts to Lund and from Lund to Howarth was abandoned, and a single escrow was established between the Bennetts and Howarth. The escrow instructions denoted Howarth as "nominee for Mavis Lund." Howarth had no previous knowledge that this relationship would exist. Howarth had thought that Lund was the listing agent for the property; she did not hear of Soeller, the actual listing broker, until contacted by the Division after the sale.[4] She, like the Bennetts, did not fully comprehend why Lund was involved in the transaction. While Howarth suspected a double escrow, she was mainly concerned with obtaining clear title to the property at the price she had offered.

---

"Well, Mavis is still in on the deal.

"How could she be in on the deal?

"She withdrew.

"Well, it's perfectly legal, perfectly legal." What the hell am I going to do, sitting down there, running out to sea half the time? I can't stay on top of the deal myself. So I tell Soeller the same thing. He says,

"No, it's perfectly legal.

"Okay. Go through with it. Get it over with. Get it out of my hair." Anything further?

MR. BABA:   But you went through with the deal?

MR. BENNETT:   Well, certainly I went through with the deal. I said, "Get it out of my hair."

\* \* \*

MRS. BERKELEY (counsel for the Division):   [W]hat is it that made you think or made you go through with the deal? Just explain to us.

MR. BENNETT:   I know that, if I get into a deal where an offer is made, which meets my demands on listing, I can have my fanny sued off. Or, if I refuse to go through with the deal with a broker on a legitimate deal, that the broker can come back to me and collect his commissions. Now, what do I want to pay somebody a commission and still have my house on my hands?

[4]Mrs. Howarth, who was a licensed California real estate saleswoman, testified as follows:

MRS. BERKELEY:   Did Mr. Lockhart show you any pieces of property on October 2, 1977?

MRS. HOWARTH:   He showed me three, two of which I didn't care for. They were out of the way. Then he said that possibly there was another one where the deal might have fallen through, but he would have to contact somebody in the Tahoe Sierra office. So he called Crystal Bay and asked for Mavis Lund. And apparently she was out on her way over, so he said, if we waited, she had the keys with her. So she came in, and he went and talked with her in another room.

\* \* \*

MRS. BERKELEY:   Okay. Can you please tell us what the price you paid for that was?

Mr. Thomas, owner of Tahoe Sierra Realty and Lund's supervising broker, testified that he had insisted on two separate transactions (Bennett-Lund and Lund-Howarth), but that the escrow company informed him that since everyone was informed and no one was unhappy, there was no need for two transactions.

The purchase was finally completed in a single transaction, with title passing directly from the Bennetts to Howarth. Soeller received $1,778, and Tahoe Sierra received $2,667, as commissions on the $63,500 sale. Lund ultimately received the $2,667 commission. The additional $4,000 was apparently the commission on the "second" sale at $67,500. The broker, Tahoe Sierra Realty, owned by the Thomases, took $1,417.50, which is 30 percent of $4,000; the selling agent took 45 percent, or $2,126.25; and Lund received the remaining $456.25 as her profit from the "sale." Mr. Thomas testified that he paid commissions based on two escrows, even though he knew there was only one, because Lund was acting as nominator and it was fully disclosed to the sellers and the buyer that there would be two escrows and a $6,667 commission. Lund received a total of $3,123.25 from the transaction.

## THE SUSPENSION OF SOELLER'S LICENSE

On appeal, we are limited to determining whether the decision of the Commission constitutes an abuse of discretion. NRS 645.760(3); Alley v. Nevada Real Estate Div., 94 Nev. 123, 575 P.2d 1334 (1978); Holland Rlty. v. Nev. Real Est. Comm'n, 84 Nev. 91, 436 P.2d 422 (1968); Barnum v. Williams, 84 Nev. 37, 436 P.2d 219 (1968); Randono v. Nev. Real

---

MRS. HOWARTH:   Sixty-seven-five.
MRS. BERKELEY:   And you signed, as the buyers?
MRS. HOWARTH:   Right.
MRS. BERKELEY:   And who signed as the sellers?
MRS. HOWARTH:   Nobody. I have never received an acceptance in writing from the Bennetts at all. I knew that the Bennetts were the owners. That came out later on.

\* \* \*

MRS. BERKELEY:   Are you saying that things did not go smoothly from the start?
MRS. HOWARTH:   I have never been in a deal that was so crummy in my life, in my five years.
MRS. BERKELEY:   Can you please explain to me, very briefly, what you thought Mavis Lund's role in this was?
MRS. HOWARTH:   I thought Mavis was the lister, until Mr. Gibbons [of the Division] said to me, "Did you ever hear of Crystal Shores?" I had never. And Clem [Soeller]—whatever his name is—I had ever [sic] heard that name.

Estate Comm'n, 79 Nev. 132, 379 P.2d 537 (1963). The Commission's action is not an abuse of discretion if it is supported by substantial evidence in the record. Lellis v. Archie, 89 Nev. 550, 516 P.2d 469 (1973); No. Las Vegas v. Pub. Serv. Comm'n, 83 Nev. 278, 429 P.2d 66 (1967); Randono v. Nev. Real Estate Comm'n, *supra.*

The Commission concluded that Clemens Soeller violated NRS 645.630(9) and (18); Real Estate Division Rules and Regulations Section VII(6); and the Real Estate Code of Ethics Part II(2) and (14).[5] The stated basis for this conclusion was Soeller's failure to secure a definite time for close of escrow on the original Lund offer and his failure to obtain written cancellation instructions for the Bennett-Lund escrow. The Commission did not make separate findings of fact to uphold this particular conclusion; however, the conclusion itself gives notice of the facts on which the Commission relied. Under such circumstances we may imply the necessary factual findings, so long as the record provides substantial evidence to support the Commission's conclusion. *See* Gorden v. Gorden, 93 Nev. 494, 569 P.2d 397 (1977); Lewis v. State, 86 Nev. 889, 894, 478 P.2d 168, 171 (1970); Richfield v. Harbor, 85 Nev. 185, 452 P.2d 462 (1969). *Compare with* Pub. Serv. Comm. v. Continental Telephone Co., 94 Nev. 345, 580 P.2d 467 (1978) (where no explanation offered for order, order should be presumed unreasonable).

---

[5]NRS 645.630 [prior to 1979 amendments inapplicable to this case].

*Grounds for disciplinary action against licensees.*

The commission may suspend, revoke, or reissue subject to conditions any license issued under the provisions of this chapter at any time where the licensee . . . whether or not acting as a licensee, is found guilty of:

\* \* \*

9. Disregarding or violating any of the provisions of this chapter, chapter 119 of NRS or of any regulation promulgated under either chapter.

\* \* \*

18. Demonstrated negligence or incompetence in performing any act for which he is required to hold a license.

Rules and Regulations Section VII(6) (1976) provides the following:

6. A licensee shall include all of the terms and conditions of a transaction in an offer or counteroffer to purchase.

The Code of Ethics, Part II (1975) provides the following:

2. In accepting employment as an agent, the licensee pledges himself to protect and promote the interests of his principal. This obligation of absolute fidelity to the principal's interest is primary, but it does not relieve the licensee from the obligation of dealing fairly with all parties to the transaction.

\* \* \*

There was testimony indicating that the Bennetts did not believe that they were legally obligated to accept the second offer involving the $4,000 "commission" to Tahoe Sierra Realty, and that they were anxious to sell because the house would become increasingly difficult to show as winter approached. However, the record also indicates that Soeller flatly told the Bennetts that if they did not accept the syphoning to the other broker of the margin between the original price and the increased price, the broker would take the buyer elsewhere. Moreover, Mr. Bennett testified that he believed he could get into trouble by refusing a legitimate offer, that Soeller led him to believe Lund's offer at $63,500 was still legally operative, and that the sale to Howarth involving Lund was legal because it was a "double escrow." The Commission apparently relied on the latter testimony, and determined that the degree of disclosure that occurred in this case was insufficient to discharge Soeller's duty to his principal.

We may not substitute our judgment for that of the Commission by weighing the evidence or passing on the credibility of witnesses. Lellis v. Archie, *supra;* No. Las Vegas v. Pub. Serv. Comm'n, *supra.* We hold that the testimony of Soeller and the Bennetts constitutes substantial evidence to support the Commission's determination that Soeller had failed to protect his principal.

Soeller's failure to ensure that the purchase agreement contained a date for close of escrow and that the Bennett-Lund escrow was cancelled in writing also demonstrates negligence or incompetence within the meaning of NRS 645.630(18). Soeller knew that the Bennetts did not want to be bound by the lower price. Leaving the escrow open and indeterminate subjected the Bennetts to the problems that they later encountered. Moreover, Soeller knew that Lund had cancelled her offer and had no earnest money on deposit when he informed the Bennetts that the Lund escrow was "still going." Soeller acted unreasonably in not reviewing the final terms of the purchase agreement and in leaving the cancellation of the escrow to the one person who stood to benefit from a continued escrow at the lower price. Substantial evidence supports the Commission's conclusion.

14.   The licensee should obtain all changes on contractual documents in writing. Any changes should be signed or initialed by all parties concerned.

Similarly, Soeller's failure to ensure that the purchase agreement contained an escrow closing date demonstrates a violation of Rules and Regulations Section VII(6). Lund's status as a real estate licensee did not remove from Soeller his responsibility to comply with the regulation and thus protect his principal. Given the evidence upholding the above infractions, the penalty assigned by the Commission was well within the Commission's discretion.

## THE REVOCATION OF LUND'S LICENSE

The Commission concluded that Mavis Lund violated NRS 645.630(1), (3), (9), (10), (18), and (19); Rules and Regulations Section VII; and the Code of Ethics, Part I(2) and Part II(2) and (14).[6] Lund contends that several of these sections do not apply because she was acting as a principal rather than as a licensee. However, NRS 645.630 provides for disciplinary action for misconduct whether or not the licensee is acting as a licensee. In Holland Realty v. Nevada Real Estate Commission, 84 Nev. 91, 436 P.2d 422 (1968), we set forth the same standard of honesty and competence for a broker's real estate activities whether he was performing as a broker or as an owner. The Commission here had before it a lengthy record, and it found Lund in violation of numerous regulations. The penalty imposed does not rest on a determination that Lund had a principal to protect.

(a) *Misrepresentation or fraud by Lund.*

---

[6]See note 5, *supra.*

NRS 645.630 [grounds for disciplinary action against licensees]:
1.  Making any substantial misrepresentation.
*   *   *
3.  Pursuing a continued and flagrant course of misrepresentation, or making of false promises through agents or salesmen or advertising or otherwise.
*   *   *
10.  Paying or receiving any rebate, profit, compensation or commission in violation of this chapter.
*   *   *
19.  Any other conduct, whether of the same or a different character from that hereinbefore specified, which constitutes improper, fraudulent, or dishonest dealing.

The Code of Ethics, Part I(2) provides the following:
2.  The licensee should do his utmost to protect the public against fraud, misrepresentation or unethical practices in the real estate field.

Substantial evidence in the record supports a determination that Lund no longer had any rights under her original purchase agreement with the Bennetts at the time she represented to Howarth and to the Bennetts, through Soeller, that she intended to consummate the agreement and pass title to Howarth as her nominee. First, the evidence would uphold a finding that the purchase agreement was a nullity because Lund admittedly failed to satisfy the condition precedent of obtaining financing. Sala & Ruthe Realty, Inc. v. Campbell, 89 Nev. 483, 515 P.2d 394 (1973); Management, Inc. v. Mastersons, Inc., 616 P.2d 356 (Mont. 1980); McDonald v. Cullen, 559 P.2d 506 (Or. 1977); Simms Co. v. Wolverton, 375 P.2d 87 (Or. 1962); Highlands Plaza, Inc. v. Viking Investment Corp., 467 P.2d 378 (Wash.App. 1970). See Bird v. Casa Royale West, 97 Nev. 67, 624 P.2d 17 (1981). The evidence would also uphold a finding that Mrs. Bennett properly rescinded the contract, see Schreiber v. Karpow, 626 P.2d 891 (Or. 1981), Ragen v. Weston, 625 P.2d 557 (Mont. 1981), or that Lund and the Bennetts mutually rescinded the contract through abandonment. Forsyth v. Pendleton, 617 P.2d 358 (Utah 1980); Mader v. James, 546 P.2d 190 (Wyo. 1976); Tucker v. Edwards, 376 P.2d 253 (Okla. 1962); Wippman v. Rowe, 540 P.2d 141 (Ariz.App. 1975). See Bird v. Casa Royale West, supra.

Once Lund's rights under the purchase agreement had been extinguished through rescission or an admitted failure of a condition precedent, she had no basis on which to involve herself in the sale of the Bennett property to Howarth.[7] There was no new offer and acceptance between Lund and the Bennetts—just a statement by Soeller that the original Lund offer "was still okay." The Commission could therefore determine on substantial evidence that Lund's representations of herself as owner of or nominator for the Bennett property violated NRS 645.630(1), (3), and (19) and the Code of Ethics Part I(2).

(b) *Violation of NRS 645.630(10).*

Lund received more than three thousand dollars from the Bennett-Howarth sale. She admits that she was not an agent for either party, and contends that she was entitled to the money as a real estate agent acting as a principal. However, Lund need not be acting as an agent to violate the real estate

---

[7]At one point during the escrow period, Lund attempted to have Soeller send to the Bennetts a letter falsely stating that the additional $4,000 "commission" for Tahoe Sierra Realty was to cover the costs of "appliance warranties, termite inspection, etc., that will be supplied and paid for by Mavis."

regulations, and her receipt of funds, whether denominated commission or profit, as a result of her misrepresentations to Howarth and the Bennetts violates NRS 645.630(10).

(c) *Lund's negligence or incompetence.*

NRS 645.630(18) prohibits negligence or incompetence in performing any act for which the licensee is required to hold a license, whether or not the licensee is acting as an agent. While the Commission held Soeller, the Bennett's agent, responsible for both failing to include a date for close of escrow in the Bennett-Lund purchase agreement and not obtaining a written cancellation of the escrow, we see no bar to the Commission holding Lund responsible for the omissions as well. Substantial evidence indicates that she breached her duty as licensee to prepare all documents carefully and completely; Soeller had even instructed her to state a close of escrow date in the agreement, and she disregarded his instructions. *Cf.* Biegler v. Nevada Real Estate Div., 95 Nev. 691, 601 P.2d 419 (1979) (negligent or incompetent within meaning of NRS 645.630(18) for broker to send inadequate closing statement). Moreover, the Commission could have found Lund negligent on the basis of her failure properly to submit the earnest money with her offer of $63,500.

(d) *The penalty.*

Unless the Commission is shown to have abused its discretion by revoking Lund's license, we may not interfere with its decision. Randono v. Nev. Real Estate Comm'n, 79 Nev. 132, 137, 379 P.2d 537, 539–40 (1962). So long as the violations found by the Commission are based on substantial evidence and are not trivial, we may not modify the assigned penalty. *See* Flanders v. State Dep't of Commerce, 87 Nev. 303, 486 P.2d 499 (1971) (technical violation of real estate regulations that does not reasonably demonstrate unfitness to continue as broker will not support revocation of broker's license). In the instant case, the violations found by the Commission are far from trivial, and are based on substantial evidence. We therefore decline to disturb the Commission's decision.

### THE SUSPENSION OF THE THOMASES' LICENSES

The Commission concluded that Lowell and Sybil Thomas, owners of Tahoe Sierra Realty, had violated NRS 645.630(9), (18), and (19).[8] The Commission based its conclusion on the

---

[8]See notes 5 and 6 *supra.*

Thomases' failure to act to protect the Bennetts and their failure properly to supervise Lund and Lockhart (Howarth's agent).

Substantial evidence in the record supports the Commission's decision. Thomas was Lund's supervising broker. Mr. Thomas admitted that the Bennett-Lund purchase agreement incorrectly stated that Tahoe Sierra Realty had acknowledged receipt of $1,000 earnest money. He also testified that he does not have a purchase agreement in his file signed by both Howarth and Lund, although he paid commissions based on two transactions.[9] Thomas never ascertained whether Lund had a right to participate in the sale of the Bennett property to Howarth and yet paid her commissions as if she had purchased the property from the Bennetts and then sold it to Howarth. The record substantiates Mrs. Thomas' knowledge of and involvement in these dealings. Tahoe Sierra Realty received $6,667 in commissions as a result of its salespersons' activities, $3,123 of which was paid to Lund. Either the Bennetts or Howarth would most likely have realized at least a portion of this amount, had the misconduct, negligence, and lack of supervision found by the Commission not occurred.

Thus, the record supports the Commission's conclusions that Soeller failed to protect the interests of his principal; that Lund did not deal honestly with either the buyer or the sellers; and that the Thomases failed adequately to supervise Lund. We therefore affirm Case No. 12547, and reverse Case No. 12418.

MANOUKIAN, J., and ZENOFF, SR. J., [10] concur.

GUNDERSON, C. J., with whom SPRINGER, J., concurs, dissenting:

I respectfully dissent.

It seems to me that my brethren have not identified, with any clarity, just how the accused in this case have been professionally remiss.

Clemens Soeller, qualifying broker of Crystal Shores Realty, listed for sale the Lake Tahoe property of Mr. and Mrs. Bennett. Mavis Lund made an offer to purchase the property at the listed price of $63,500, contingent upon obtaining financing. It

[9]Moreover, Thomas indicated that he could not produce a purchase agreement signed by the Bennetts and Howarth.

[10]The Chief Justice designated THE HONORABLE DAVID ZENOFF, Senior Justice, to participate in this case, pursuant to Nev. Const., art. 6, § 19(1)(c); SCR 10.

should be noted that, although Ms. Lund is licensed as a salesperson associated with Tahoe Sierra Realty, she made the offer to purchase *on her own behalf*—and not in any fiduciary or representative capacity. The Bennetts accepted Lund's offer; however, after it appeared Lund would be unable to obtain financing, they advised Soeller that they desired to increase the listing price to $67,500.

Shortly thereafter, a salesperson who knew Lund, and who also was associated with her at Tahoe Sierra Realty, chanced to be contacted by a prospective purchaser, one Carmen Sylvia Howarth. Howarth seemed interested in buying property of the general kind owned by the Bennetts. Knowing that Lund had contracted to purchase the Bennett property, the other salesperson asked Lund if she was willing to "sell that house on Tomahawk that you have the offer on." Still dealing for her own account, Lund indicated that if the prospective purchaser would buy the same for $67,500, with Lund receiving the difference between that figure and $63,500, she would "sell" her interest. Howarth inspected the home, and agreed to offer that price.

The offer was presented, in detail, to Clemens Soeller, who presented it to the Bennetts. Basically, the contract documents proposed that the Bennetts would net the same amount from the purchase price of $67,500 as they would have from a purchase price of $63,500. Neither Ms. Lund, nor Tahoe Sierra Realty, practiced any deception on Soeller or on the Bennetts. The Bennetts knew that if they accepted the offer, the $4,000 difference between $67,500 and $63,500 would be paid as "additional commission" to Tahoe Sierra Realty, Ms. Lund's broker, for producing Howarth as a buyer. How Tahoe Sierra Realty would later distribute this "additional commission" was not a concern material to the Bennetts.

It is uncontroverted that Soeller informed the Bennetts that they had no legal obligation to accept the offer. As he explained, however, if they did not accept the offer, Tahoe Sierra Realty—and Ms. Lund—had no obligation to produce Howarth as a purchaser. This advice appears to have been legally sound, and, in any event, was in no way dishonest. Moreover, it should be noted that Mrs. Bennett, who handled the transaction on behalf of herself and her husband, is a licensed real estate salesperson in California.

The Bennetts undoubtedly felt abused; however, they were not misled. They signed the escrow instructions, which accurately reflected the offer, and all funds were disbursed in accordance with such instructions. They did so even though Soeller had informed them of all facts known to him, and of

their right to refuse the offer. *See* Holland Rlty. v. Nev. Real Est. Comm'n, 84 Nev. 91, 436 P.2d 422 (1968). He did not conceal anything material to the transaction, nor did he help Lund to do so. He did not take a secret profit, nor did he help Lund to do so. It seems to me that he acted competently and conscientiously, when confronted with the somewhat unusual demands of Lund and Tahoe Sierra Realty.

In the absence of a regulation limiting the amount which a non-listing broker may charge for producing a buyer, I fail to perceive how Lund and Tahoe Sierra Realty may be subjected to discipline. I repeat: they had neither a contract with, nor a fiduciary obligation to, Mr. and Mrs. Bennett. They were not guilty of fraud or misrepresentation.[1]

I therefore respectfully submit that we should affirm the judgment of the district court in case No. 12418, and that we should reverse the judgment of the district court in case No. 12547.

[1] As noted above, Lund and Tahoe Sierra Realty were candid about the terms they submitted to the Bennetts, through Soeller. Furthermore, it appears they were candid in stating the terms of the transaction to the purchaser, Carmen Sylvia Howarth. Not only were the terms clearly set forth in the escrow instructions, but the transaction's essence was summarized in a letter from Lund to Howarth which recited:

Dear Sylvia,
The appraiser came 18 Oct, will have a commitment back to us in two weeks or**é** [sic] sooner. He liked the house very much. Receipt below was signed by our secretary Nancy Sargent who deposited the funds in our trust account, as required by law. *Escrow instructions are enclosed.* Should you have any questions please feel free to phone us at 702 831 3166. *As you will notice, title will pass from Bennett to you as my nominee—Sierra Realty will receive $4,000.00 commission on the sell to you. Sure you understand since you are in real estate.*
/s/ Mavis
Mavis

(Emphasis added.)